# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Case No. 1:24-MJ-261 (CFH) |
| KRIS ROGLIERI, | ) |
| Defendant. | ) |

**U.S. DISTRICT COURT - N.D. OF N.Y.**
**FILED**
MAY 28 2024
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about December 12, 2023 through December 29, 2023, in the counties of Albany and Warren in the Northern District of New York, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:
Please see attached affidavit.

☒ Continued on the attached sheet.

_____
Complainant's signature
FBI Special Agent Jonathon Vick
*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date: May 28, 2024

_____
*Judge's signature*

City and State: Albany, New York

Hon. Christian F. Hummel, U.S. Magistrate Judge
*Printed name and title*

## Affidavit in Support of a Criminal Complaint

Special Agent Jonathon Vick, of the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states:

### Introduction

1. I respectfully make this affidavit in support of a criminal complaint charging Kris Roglieri, of Queensbury, New York, with wire fraud committed in violation of 18 U.S.C. § 1343.

2. I have been employed since August 2022 as an FBI Special Agent. I am presently assigned to the Albany Field Office investigating public corruption and financial crimes.

3. The facts in this affidavit come from my personal observations, my training and experience, my and others' analysis of various categories of records and information, and information obtained from other law enforcement officers and witnesses. The information contained in this affidavit is not an exhaustive account of everything I know about Roglieri or everything I have learned in this investigation. Rather, it contains only the facts that I believe are necessary to establish probable cause in support of a criminal complaint. Where statements of others are related in this affidavit, they are related in substance and in part. Also, if a specific date is given for a financial transaction, it is approximate.

### Background

4. This request for a criminal complaint arises from an ongoing investigation into a fraud and money laundering scheme perpetrated by Roglieri and others via Prime Capital Ventures, LLC ("Prime Capital"), a purported commercial lending business.

5. Prime Capital was formed in December 2021; Roglieri is its sole member.

1

6. At all relevant times, Roglieri operated Prime Capital as well as affiliated entities including Prime Commercial Lending, LLC ("Prime Commercial"), from offices in Albany. Prime Capital and Prime Commercial had bank accounts at KeyBank in Albany.

7. At all relevant times, Individual A was Executive Vice President of Prime Capital.

8. Prime Capital held itself out as a commercial lending business. As part of contractual arrangements with its borrower clients situated across the country, Prime Capital obtained upfront interest payments from prospective borrowers while it sought to secure loans for those borrowers; these upfront interest payments were characterized by Prime Capital as the "Interest Credit Account Payment," or "ICA" payment for short. ICA payments did not represent fees to Prime Capital. Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest. An ICA payment would also be refundable if Prime Capital failed to secure a loan for the borrower client.

9. Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding in this District begun on December 19, 2023, in the case captioned *In re Prime Capital Ventures, LLC*, No. 1:23-bk-11302 (Bankr. N.D.N.Y.) (the "Involuntary Bankruptcy Proceeding"). In that proceeding, three Prime Capital creditors filed a petition to put Prime Capital into bankruptcy based on allegations that Prime Capital had fraudulently taken and refused to return $43 million from numerous entities, including more than $20 million from the petitioning creditors.

10. In the Involuntary Bankruptcy Proceeding, the petitioning creditors alleged that Prime Capital defrauded its borrower clients by using the ICA funds that those clients paid to Prime Capital – as pre-payment of interest on yet-to-be issued loans – for Prime Capital's own purposes and then failed to return the ICA funds when the loans did not materialize.

11. United States Bankruptcy Judge Robert E. Littlefield Jr. dismissed the Involuntary Bankruptcy Proceeding on January 9, 2024, at the request of both the petitioning creditors and Prime Capital. Roglieri personally filed for bankruptcy on February 15, 2024 ("the Personal Bankruptcy Proceeding"). No. 1:24-bk-10151 (Bankr. N.D.N.Y.).

12. On March 14, 2024, as part of his Personal Bankruptcy Proceeding, Roglieri gave sworn testimony at a creditors meeting, which was audio-recorded. Roglieri stated that he was the only person with access to Prime Capital's bank accounts and Prime Commercial's bank accounts. Roglieri stated that he was the only person with online access to the accounts, and the only person with the ability or authority to make wire transfers from those accounts.

**Basis for a Probable Cause Finding that Roglieri Has Committed Wire Fraud**

13. 1800 Park Avenue LLC ("1800 Park") is a Minnesota company that sought a loan from Prime Capital in order to build a commercial egg production facility. On or about December 12, 2023, Prime Capital provided to 1800 Park a "Commitment to Fund Letter" by which Prime Capital committed to fund a line of credit in the amount of $98,905,467. Roglieri signed the letter on Prime Capital's behalf. Roglieri and Prime Capital made this commitment to fund a nearly $100 million project even though, as of December 12, 2023, Prime Capital had failed to fund numerous loans promised to earlier clients; failed to return tens of millions of dollars in ICA payments to earlier clients once those loans did not materialize; and had been sued multiple times by clients alleging fraud and seeking the return of ICA payments.

14. In emails sent to 1800 Park on December 11, December 15, December 18 and December 19, representatives of Prime Capital and Prime Commercial informed representatives of 1800 Park that 1800 Park needed to conduct a "soft close" on the deal as soon as possible, if 1800 Park wanted to keep the loan terms that were being offered; a soft close would include an

3

ICA payment made by 1800 Park. For instance, in the email sent to 1800 Park representatives on December 19, a Prime Capital/Prime Commercial representative stated:

> Per Kris, [1800 Park needs] to come to the soft close with at least $10M, preferably $12- or total requested of $15M.
>
> ...
>
> Please get with your clients, and explain the urgency of the situation. We all have worked too hard for this one.

A draft of this email was sent to Roglieri on December 19, prior to its being sent to a representative for 1800 Park.

15. On or about December 19, a representative of 1800 Park emailed Individual A, and others, stating that 1800 Park could make an ICA payment in the amount of $5 million and "it would help us feel comfortable depositing the $5mm if you could point us to the place in the loan documents or send us the deposit agreement where it outlines that the funds sent to establish the ICA are fully refundable if we cannot consummate the deal on the back." Individual A forwarded this email to Roglieri on December 20.

16. On December 21, Individual A emailed to 1800 Park a draft Deposit Agreement between 1800 Park and Prime Commercial[1]; this agreement specified that the ICA payment would be refundable if 1800 Park and Prime Commercial did not enter into a loan agreement.

17. On or about December 22, Roglieri signed the Deposit Agreement on behalf of Prime Commercial; that agreement, as revised by 1800 Park from its initial draft, stated:

> The Lender hereby acknowledges receipt of such funds and agrees to hold the [ICA

---

[1] No explanation was given as to why the contracting party would be Prime Commercial, as opposed to Prime Capital. During his testimony at the creditors meeting on March 14, 2024, Roglieri stated that Prime Commercial was a lender for smaller transactions (what he called "small-balance commercial mortgages" and "loan brokering"), whereas Prime Capital was a lender for larger transactions (*e.g.*, commercial real estate and construction loans).

4

payment] in a separate and distinct account for Borrower, subject to the terms and conditions of this Agreement. The Deposit Amount should be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto.

By this agreement, Roglieri and Prime Commercial agreed to hold 1800 Park's ICA payment in a "separate and distinct account," and to hold the payment as a "trust fund"; they also agreed that the ICA payment would be refunded if the parties did not enter into a loan agreement.

18. On December 22, 1800 Park wire transferred, from an account at Home State Bank[2], a $5 million ICA payment to the KeyBank account in Prime Capital's name, pursuant to wire transfer instructions attached to the Deposit Agreement (these instructions erroneously identified the account holder as Prime Commercial).

19. Based on the FBI's financial analysis, there is probable cause to conclude that the ICA payment was not held as a "trust fund" in a "separate and distinct account." 1800 Park was instructed to transfer the ICA payment to Prime Capital's account at KeyBank, for which Roglieri was the only signatory. When 1800 Park's ICA payment entered this account, its balance was $1,923.66.

20. Also on December 22, Roglieri transferred the entire ICA payment, $5 million, from Prime Capital's account to Prime Commercial's account at KeyBank, for which Roglieri was the only signatory. At the time of this $5 million transfer, this Prime Commercial account's balance stood at $57,045.90. After the account balance increased to $5,057,045.90[3], Roglieri made the following transfers and payments from the Prime Commercial account, among others:

---

[2] According to the Federal Deposit Insurance Corporation, Home State Bank is based in Minnesota and has branches only in Minnesota.

[3] Between December 22 and 29, the Prime Commercial account received a total of $27,809.93 from a title company; these were the only other transfers into the account during that time period.

5

- December 22: $2 million was transferred to a credit union account standing in the name of a Virginia company owned by an associate of Individual A. Asked, at a creditors meeting held on April 4, 2024, about the company that received this transfer, Roglieri stated, "it could have been a borrower or a creditor. I'm not sure without looking at the records."

- December 22: $950,000 was transferred to a Prime Capital client, as partial loan funding for that client's real estate project in Saratoga County.[4] Roglieri thus used part of 1800 Park's ICA payment to meet a financial obligation that Prime Capital had made to another client. Also on December 22, Roglieri and this client's owner exchanged numerous text messages about this $950,000 transfer, with Roglieri texting the owner, on December 22 at about 2:11 p.m., that he had transferred the funds.

- December 22 to 29: a total of $34,000 was transferred to personal KeyBank accounts for which Roglieri was a signatory.

- December 26: $84,000 was paid to Wrist Aficionado, a high-end watch company, for Roglieri's purchase of a Rolex day-date 36 mm yellow gold diamond bezel watch.

- December 26: $101,000 was paid to XO Global, which provides private jet services. This payment was for round-trip, private air travel between Albany International Airport and Anguilla, for a family vacation that Roglieri took from about December 29, 2023 to January 5, 2024.

- December 26: $50,000 was paid to a law firm that had represented Prime Capital in the Involuntary Bankruptcy Proceeding.

---

[4] On January 29, 2024, this client filed a lawsuit against Prime Capital in Saratoga County Court, alleging that Prime Capital had failed to fully fund the real estate project.

- December 29: $400,000 was paid to another law firm that had represented Prime Capital in the Involuntary Bankruptcy Proceeding as well as in another case in the United States District Court for the Northern District of New York.

21. On January 3, 2024, after learning of the Involuntary Bankruptcy Proceeding, 1800 Park demanded back its ICA payment, and sent a letter to Prime Commercial pursuant to the notice provisions of the Deposit Agreement; a Prime Commercial representative acknowledged receipt of the letter that same day. To date, 1800 Park has not received back any part of its $5 million ICA payment and has brought an adversarial action against Roglieri, and others, in Roglieri's Personal Bankruptcy Proceeding.

## Conclusion

22. Based on the foregoing, I respectfully submit that this affidavit establishes probable cause for a criminal complaint charging Kris Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343.

Attested to by the affiant:

_____
Johathon Vick
Special Agent
Federal Bureau of Investigation


I, the Honorable Christian F. Hummel, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on May 28, 2024 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Christian F. Hummel
United States Magistrate Judge